UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| Charles Hill and Donna Hill, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 1:18-cv-05592 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| Parole Agent C. Harrington, Parole Agent | ) | |
| Walls, Elena McKenna, Scott Liebhaber, | ) | |
| Robert Purvis, Matthew Pufpaf, | ) | |
| John Gartner, David Rodriguez, | ) | |
| Alan Lasch, Kevin Geyer, Steven Suvada, | ) | |
| and the City of Chicago, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

Charles and Donna Hill brought this case against 11 law enforcement officers (a mix of parole agents and police officers) and the City of Chicago, alleging that the officers violated the Hills' constitutional rights during a search of their home in August 2016. R. 1., Complaint.[1] One of the parole agents, Jacob Walls, moves for summary judgment against the remaining claims against him; the other parole agent, Christopher Harrington, moves for partial summary judgment. R. 177, Harrington and Walls Mot. for Summ. J.[2] The other defendants—nine Chicago police officers and the City of Chicago as indemnifier—move for summary judgment on all of the claims asserted against them. R. 178, City Defs.' Mot. for Summ. J. The Hills, in turn, have

---

[1]The Court has federal question jurisdiction over this case. 28 U.S.C. § 1331. Citations to the docket are "R." followed by the docket entry number.

[2]The Hills also had asserted a due process claim, but that claim was dismissed in a prior opinion. R. 98.

moved for summary judgment as to liability only on certain claims against all of the Defendants. R. 194, Pls.' Mot. for Summ. J. For reasons explained in this Opinion, the Defendants' motions are granted and the Hills' motion is denied.

## I. Background

In deciding cross motions for summary judgment, the Court views the facts in the light most favorable to the respective non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). So when the Court evaluates the Defendants' summary judgment motions, the Hills get the benefit of reasonable inferences; conversely, when evaluating the Hills' motion, the Court gives Harrington and Walls and the City Defendants the benefit of reasonable inferences.

### 1. 4436 West Jackson Boulevard

On August 18, 2016, Charles and Donna Hill were living at 4436 W. Jackson Boulevard in Chicago. R. 177-2, Harrington/Walls Rule 56.1 Statement of Material Fact (HW DSOF) ¶ 4. Specifically, the Hills lived on the second floor of the building— according to the Hills, the first and second floors are two distinct apartment units with separate entrances and different keys. R. 202, Pls.' Statement of Additional Material Fact in Response to City Defendants Motion (PSOAF City) ¶ 1. Everyone agrees that the Hills' grandson, Keitrion Lewis, lived in the same building as his grandparents on August 18, 2016. HW DSOF ¶¶ 7, 9; PSOAF City ¶ 11. Lewis was on parole at the time. HW DSOF ¶¶ 8, 10. The Hills assert that Lewis lived in the *first*-floor unit with his aunt, Shatrion Hill. HW DSOF ¶ 15; PSOAF City ¶¶ 10–11. They say that he did not have a bedroom in his grandparents' *second*-floor apartment, did not

have keys to the apartment, and could only visit if someone was home to let him in. PSOAF City ¶ 12. Harrington and Walls, however, claim that Lewis's parole agent had changed Lewis's address from the first-floor unit to the second-floor unit on August 6, 2015. HW DSOF ¶ 16.

### 2. The Search

On August 18, 2016, Lewis reported in-person to an IDOC "reporting center" in downtown Chicago. HW DSOF ¶ 24. That day, the Illinois Department of Corrections (IDOC) was conducting "compliance checks"—sending parole agents to the residences of parolees to check up on parolees who supposedly were not complying with parole conditions. HW DSOF ¶¶ 26, 27. While on parole, Lewis was not allowed to possess weapons, ammunition, or narcotics, or to live in a residence with weapons or ammunition. HW DSOF ¶¶ 23, 27; PSOAF City ¶ 16. Christopher Harrington, a parole agent employed by IDOC, believed that Lewis had missed some of his required daily reporting. HW DSOF ¶¶ 6, 28. The Hills dispute this and assert that Lewis was in compliance with all conditions of his parole. PSOAF City ¶ 16; R. 199, Pl. Resp. to HW DSOF ¶ 28. In any event, Lewis was brought from the reporting center to his home at 4436 W. Jackson for a compliance check. *See* HW DSOF ¶ 29.

The Defendants describe the ensuing search of the *second*-floor apartment (where the Hills live) at 4436 W. Jackson Blvd. as a "compliance check." HW DSOF ¶ 29; R. 179, City Defs.' Statement of Material Facts (City DSOF) ¶ 11. The Hills repeatedly object to this characterization and prefer the label "illegal warrantless

3

search." Pls.' Resp. to HW DSOF ¶ 29. For now, the term "the search" will do.[3] The litigants' accounts of the search diverge significantly. Donna Hill opened the door for the IDOC parole agents. HW DSOF ¶ 31. Mrs. Hill says Harrington appeared at her door with Lewis. R. 201, Pls.' Statement of Additional Facts in Response to Harrington and Walls (PSOAF HW) ¶ 19; R. 195-2, Declaration of Donna Hill (D. Hill Decl.) ¶ 10.[4] She says Harrington told her that he was there to search Lewis's room, to which she responded that Lewis did not live upstairs; she also asked to see a warrant, and told Harrington that he did not have permission to search her home. PSOAF HW ¶¶ 20–22. Despite those protestations, Harrington went upstairs, told her he did not need a warrant, and searched the apartment. PSOAF HW ¶¶ 21–22. Then, Mrs. Hill says, he radioed for backup, and at least two or three more IDOC parole agents came

---

[3]"The search" is intended as a neutral term and reflects no judgment by the Court as to which litigant's version of events is correct. That is a question of fact for the jury to decide.

[4]Harrington and Walls contend that Donna Hill could not personally name any of the officers or agents who were present and searched her home that day. HW DSOF ¶ 32. This ignores her sworn declaration. The Defendants contend that this declaration improperly contradicts Donna's earlier deposition testimony and must be ignored. R. 212, Harrington and Walls Reply Br. at 3–4. As a general principle, it is true that parties cannot use affidavits to contradict their depositions and save themselves from summary judgment. *See Diliberti v. United States,* 817 F.2d 1259, 1263 (7th Cir. 1987). On the point of Harrington's identity, however, the Hills' declarations do *not* contradict their earlier testimony. Neither of the Hills ever testified that Harrington was *not* present at their home. During her deposition, Mrs. Hill testified that she did not personally know Harrington, but that she believed him to be the "tall, black guy" who brought Lewis to her door in cuffs, based on later conversations with her grandson. R. 179-3, D. Hill Dep. 137:4–22. It is not a contradiction to her testimony that later, when she had an opportunity to see a photo of Harrington, she was able to positively identify him as the agent she met that day. D. Hill Decl. ¶¶ 7–8.

Similarly, Charles Hill testified that a tall officer prevented him from entering his house, and later clarified that the officer was Black. R. 179-1, C. Hill Dep 67:19–24, 69:4–6, 79:9–10, 101:20. He also thought the officer was Harrington but admitted that he could not know for sure. *Id.* 161:5–162:5. Again, it is not a contradiction that later, after seeing Harrington in person, Mr. Hill was able to confirm that he had interacted with him. R. 195-1, C. Hill Declaration ¶¶ 5, 8. The Hills' declarations identifying Harrington as the officer they met at their residence will be considered for purposes of these motions.

and joined the search. PSOAF HW ¶ 23. Aside from Harrington, she could not name any of the individuals who participated in the search. HW DSOF ¶¶ 32–36. Mrs. Hill was in the apartment for a few minutes while the search began, before asking an officer if she could leave with the children who were in her care at the time. *Id.* ¶ 38. (Mrs. Hill was running a child daycare business from the second-floor apartment. PSOAF HW ¶ 3.) She does not remember whom she asked, but after three or four minutes, an officer said she could leave with the children, so she did. HW DSOF ¶¶ 38–40. A few minutes later, she went back for her purse and saw that parole agents had "ransacked" her entire apartment. PSOAF HW ¶ 25. Five to ten minutes after that, a Chicago police sergeant with white hair told her to leave the house because they were "bringing dogs in." *Id.* ¶ 26. She left and went across the street, sat on the curb, and from that vantage point saw a CPD officer take a dog into the house. PSOAF HW ¶ 27. Then her neighbor invited her to sit on her porch, where Mrs. Hill remained for about 25 minutes. HW DSOF ¶ 44; R. 199, Pl. Resp. HW DSOF ¶ 44.

Charles Hill arrived home while the search was underway. HW DSOF ¶ 48. The Defendants say that "an officer" told Mr. Hill that he could not enter the house. *Id.* ¶ 51. Mr. Hill says it was Harrington and that the two argued. PSOAF HW ¶¶ 28–29. Mr. Hill also says that he asked Harrington for a warrant or other paperwork authorizing the search and told Harrington that the agents did not have permission to be there; according to Mr. Hill, Harrington responded that he did not need a warrant. *Id.* Mr. Hill eventually gave up and waited on the porch. *Id.* ¶ 30. Around 20 minutes later, he saw two IDOC parole agents taking one of his guns out of his home.

*Id.* Mr. Hill lawfully owned his guns, and he tried to explain this to the agents and to Harrington, including by showing Harrington a valid Firearm Owners Identification card and valid Permanent Employee Registration Card. *Id.* ¶¶ 2, 30. Mr. Hill says Harrington told him at this point that the agents were there because the Hills had a felon living in their apartment, which Mr. Hill denied. *Id.* ¶ 31. In addition to the gun already described, Mr. Hill asserts that another firearm, a holster, ammunition, and $2,000 were taken from his home during the search. HW DSOF ¶ 63. The guns were not returned to him that day, and Mr. Hills's attempts to recover them from the police later were unsuccessful. PSOAF HW ¶¶ 32, 37.

Harrington and Walls offer a much vaguer account of the search. They say that "agents arrived" at the Hills' door. HW DSOF ¶ 31. They place Harrington at the scene but say he "does not recall entering the home." *Id.* ¶¶ 66–67. Nor does he recall either of the Hills asking for a warrant or declaring that the parole agents did not have permission to search their apartment. *Id.* ¶¶ 67–69. Harrington does recall seeing Mr. Hill come out of the house (contradicting Mr. Hill's testimony that he was not permitted to enter). *Id.* ¶ 69. By his account, Harrington merely put the items taken from the Hills' home in the trunk of his car and drove them to the Chicago Police Department's 11th District for inventory. *Id.* ¶¶ 70–71. The parties agree that IDOC Parole Agent Walls was not present at all and had no role in the search. *Id.* ¶ 74; Pl. Resp. to HW DSOF ¶ 74.

For its part, the City of Chicago asserts that none of the named Chicago Police Department (CPD) officers entered the Hills' second-floor apartment. City DSOF

¶ 14. Mr. Hill's property was recovered by IDOC parole agents, not Chicago police officers. *Id.* ¶ 16. The City says that Harrington called CPD for assistance at 10:09 a.m. that day. *Id.* ¶ 19. In response, CPD K9 Officer Steve Martinez—who is not a defendant—went to the scene. *Id.* ¶ 22. When Martinez arrived, he saw no other CPD officers or cars. *Id.* ¶ 24. Martinez spoke with IDOC agents, who showed him the recovered firearms and ammunitions and told him they needed a canine to search the apartment for any more firearms and ammunition. *Id.* ¶¶ 23, 26–27. Martinez had his dog with him in the car, but the dog was not able to perform a firearms or ammunition search. *Id.* ¶¶ 25, 28. So another CPD K9 officer, Officer Thomas Nowak (also not a named defendant), came to the scene, arriving at 10:25 a.m. *Id.* ¶ 29. Nowak's dog, Squiggy, was trained to detect explosives including gunpowder. *Id.* ¶ 34. After discussing the situation, Nowak and Martinez took Squiggy into the apartment to conduct a search. *Id.* ¶¶ 35–36. The City says they (the two K9 officers) were the only CPD officers in the apartment during the brief canine search. *Id.* ¶ 39. They quickly determined the home was not safe for Squiggy, reported the results to the IDOC officers, and left the scene. *Id.* ¶¶ 36, 40, 41, 43. In his report, Nowak noted that another Chicago police car had arrived on the scene. *Id.* ¶ 42.

At around 10:43 a.m., Defendant Sergeant John Gartner arrived on the scene to assist the IDOC agents. City DSOF ¶ 44. Harrington told Gartner that IDOC agents had recovered guns and ammunition from the home and that the IDOC wanted the CPD to take possession of the items and inventory them. *Id.* ¶ 45. Gartner waited in his police car for the IDOC to conclude its search. *Id.* ¶ 46. While he was

waiting, Defendants Rodriguez and Liebhaber drove by and briefly spoke with Gart-ner. *Id.* ¶ 47. According to the City Defendants, none of the three entered the house or saw any other CPD officers on the scene. *Id.* ¶¶ 48–49. All three say they stayed in their cars. *Id.* ¶ 50. Rodriguez and Liebhaber did not speak to the Hills. *Id.* ¶ 52. Gartner admits that he spoke briefly with Mr. Hill, who asked Gartner how to recover his guns. *Id.* ¶ 53. The Hills allege that the police sergeant who told Mrs. Hill to leave her house was Gartner, and that he had entered the Hills' home while Harrington was searching it. PSOAF City ¶ 26.[5] Gartner and the Defendants deny this. R. 229, City Resp. to PSOAF ¶ 26.

According to the City, the remaining defendants—Geyer, Lasch, McKenna, Pufpaf, and Purvis—were not at the scene and did not search the apartment at 4436 W. Jackson Blvd. City DSOF ¶ 51. The Hills deny this assertion. R. 204, Pls.' Resp. to City DSOF ¶ 51. In support of this denial, they cite various affidavits stating that multiple CPD officers were at the house and entered the home, as well as an Office of Emergency Management and Communications (OEMC) Event Query linking CPD beats associated with the Defendants to the incident at the house. *Id.*

### 3. Inventory of Weapons / Declination of Charge

When the search was over, Gartner drove Lewis to the 11th District Police Station while Harrington transported the property seized from the Hills' home to the

---

[5]The Plaintiffs, in their corrected response to the Defendants' Statement of Additional Material Facts on the *Plaintiffs'* Motion for Summary Judgment, introduce additional deposition testimony to support their assertion that Gartner entered their home. Pls.' Resp. to DSOAF, ¶¶ 1–3, 14, 15, 19, 22. The evidence comes too late to be considered in the context of the Defendants' motions. It will be discussed more fully in the Analysis section below, addressing Plaintiffs' motion.

station. City DSOF ¶ 54. At the station, Gartner directed Defendants McKenna and Liebhaber to inventory the weapons and ammunition Harrington had seized from the Hills' home and had brought to the station. *Id.* ¶ 57. Defendants Pufpaf and Purvis helped McKenna and Liebhaber with this task and Defendant Geyer approved their reports. *Id.* ¶¶ 58–59. The City acknowledges that the seized weapons remain in CPD custody, but the City also says that the weapons cannot be released without a court order due to a litigation hold. *Id.* ¶¶ 75–76.

Meanwhile, Defendant Steven Suvada of the CPD conducted a follow-up investigation of possible illegal possession of a weapon by Lewis. City DSOF ¶ 63. Suvada's investigation involved reviewing "reports of the underlying incident" and speaking with Lewis. *Id.* ¶¶ 64–65, 67. According to the City, Lewis told Suvada that he had ammunition in his bedroom, but Suvada learned from a parole agent that this ammunition, which would be needed to charge Lewis with a parole violation, had not been turned over to CPD. *Id.* ¶ 67. When the parole agent told Suvada that he could not get him the ammunition in time for a charge to be filed, Suvada decided not to charge Lewis and instead let him go. *Id.* ¶¶ 68–70.

## II. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating

summary judgment motions, courts must view the facts and draw reasonable infer-ences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judg-ment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

### A. Parole Agent Walls

All parties agree that IDOC Parole Agent Jacob Walls was not present at 4436 W. Jackson Blvd. on August 18, 2016, and he had no role in the search. HW DSOF ¶ 74; Pls.' Resp. to HW DSOF ¶ 74. The Hills' response brief mentions its opposition to granting summary judgment for Walls, but in reality the response focuses exclu-sively on Harrington. R. 200, Pls.' Resp. Br. HW. Because the Hills have not alleged any dispute of material fact on the claims against Walls or rebutted the Defendants' argument in favor of summary judgment for Walls, Walls's motion for summary judg-ment is granted, and all claims against him are dismissed.

### B. Christopher Harrington

Harrington has moved for partial summary judgment: he seeks dismissal of one of claims against him in its entirety and part of a second claim. HW Mot. for Summ. J. The Court will examine each claim in turn.

### 1. Count 3: Damage to Property

Count 3 of the Complaint is entitled, "Illegal Seizure and Retention of Property, and Damage to Property," and is brought on behalf of Charles Hill only. Compl. at 8. Harrington argues for the dismissal of the "damage to property" half of this claim, on the grounds that Mr. Hill cannot identify who damaged his property. HW Mot. for Summ. J. ¶ 5.

In his response brief, Mr. Hill announces that he actually is no longer seeking damages for the broken property. He explains that Count 3 had been based only on a broken lock on the room where he kept his guns, and now clarifies: "Plaintiff is not seeking any monetary relief for this small item, but is merely seeking to use the fact of the damaged lock to prove that defendant officers and agents thoroughly searched his home, including a locked room, as part of the proof of his emotional damages." Pls.' Resp. Br. HW at 5. What Mr. Hill describes here is a desire to offer the broken lock as evidence to support the first two claims in the Complaint, that is, unconstitutional entry and search of his home, and unreasonable scope of the occupation and search. Because he is not seeking any damages specific to the property damage, he has essentially given up this claim.

Lest Harrington rejoice too soon, however, the Court reminds him that he did not seek to dismiss the claim for unreasonable scope of the search (Count 2). At trial, Mr. Hill might very well be allowed to introduce evidence of the allegedly damaged property to help determine liability and damages on that claim. Harrington argues that because Mr. Hill has not alleged specifically who committed what damage in the home, Mr. Hill cannot bring claims based on the damage against Harrington. R. 177-1, HW Defs.' Br. at 10–12. Harrington cites two Seventh Circuit cases for the proposition that when a plaintiff cannot identify which defendant committed damage, the claims must be dismissed. *See Hessel v. O'Hearn*, 977 F.2d 299, 304–05 (7th Cir. 1992) (where plaintiff could not identify which of 14 law enforcement defendants took a can of soda, he could not bring claims against any of them); *Colbert v. City of Chicago*, 851 F.3d 649, 657–58 (7th Cir. 2017) (where plaintiff was not present during search and could not identify which of four officers committed property damage, claim could not survive summary judgment, although a "conspiracy of silence" claim might have fared better). Even if Harrington is trying to foreclose the use of the damaged property against him at trial, as if this were a motion in limine, the Court would view the facts in the light most favorable to the Hills. In that light, there is enough evidence to allow a reasonable jury to conclude that Harrington directed the search of the Hills' home. *See* D. Hill Decl. ¶¶ 10–22 (Harrington brought Lewis to the home, began the search, and called other IDOC officers to help); C. Hill Decl. ¶¶ 9, 12, 13 (Harrington told Mr. Hill he could not enter his home, and denied needing a warrant for the search); R. 179-8, Gartner Dep. 78:18–79:6 (CPD Sergeant Gartner spoke primarily to

12

Harrington about the search). If Harrington directed the search, then a jury can hold him responsible for the damage caused during that search even if he did not personally break the lock. At the very least, as the director of the search, he must have failed to intervene as other agents committed the damage (or so a reasonable jury could find). In any event, the damage-to-property aspect of Count 3 against Harrington is dismissed.

### 2. Count 5: Detention

Next, Harrington seeks summary judgment on the Hills' claim that they were detained in violation of the Fourth Amendment (as applied through the Fourteenth Amendment's Due Process Clause to state and local officers). The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. Harrington contends that neither of the Hills were detained, because they were never arrested and were free to move around the area. HW Defs.' Br. at 12–14. Although an officer at one point told Mrs. Hill to wait before leaving her apartment, she has offered no description of the officer, so there is no way to know if that was Harrington. HW Defs.' Br. at 14.[6] The Hills counter that they were detained when they were forbidden from entering their own home. Pls.' Resp. to HW DSOF ¶ 45.

The Hills' problem is that they cite no case to support their argument that *excluding* them from their home amounted to a detention. The inverse is certainly

---

[6] The Hills do not seem to rely on this incident as a detention, and even if Harrington had detained her in this manner, the three- to four-minute wait likely would have resulted only in minimal damages.

true, as affirmed in one of the cases the Hills do cite: "A person who is not free to leave his home while officers are conducting a search is 'seized' for Fourth Amendment purposes." *Jacobs v. City of Chicago*, 215 F.3d 758, 772 (7th Cir. 2000) (citing *Michigan v. Summers*, 452 U.S. 692, 696 (1981)). But the Hills do not argue that they were trapped in their home. They argue instead that Mrs. Hill was detained when she was ordered *out* of her home, and Mr. Hill when he was not permitted to *enter* it. Pls.' Resp. Br. HW at 10.[7] In the absence of the Hills offering any case law to support their view that this amounted to a detention, there is no basis to extend the definition of a Fourth Amendment seizure to encompass this scenario. The Hills were not detained. And because they were not detained at all, there is no need to consider whether they were detained unlawfully.

At the very least, Harrington is entitled to qualified immunity on this claim. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (cleaned up).[8] Even if the Seventh

---

[7]Although the Hills argue that Donna was "forced to… watch from across the street," nothing in the record suggests that any law enforcement officer told her that she had to stay across the street, which might have constituted a seizure. Pls.' Resp. Br. HW at 10. Similarly, the Hills argue that Charles "was forced to remain on his porch," but again the record does not suggest that any law enforcement officer ordered him to do so. *Id.* The Plaintiffs' use of the passive voice betrays the lack of a law enforcement actor as the source of those purported directives. The paragraphs of the Plaintiffs' Statement of Additional Material Facts cited in the brief do not allude to any Defendant or law enforcement officer forcing the Plaintiffs to stay in any particular location outside the apartment. HW PSOAF ¶¶ 26–30. Rather, the facts limit the Plaintiffs to asserting that they were not permitted to be in their home.

[8] This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

Circuit or Supreme Court would eventually conclude that individuals have a Fourth Amendment right not to be excluded from their homes during a search, the absence of any case law to this effect to date means it is not a clearly established right.

This is not to say that the Hills have alleged no violations of their constitutional rights. Their claim against Harrington that the search itself was unlawful is intact. And this alleged intrusion into their privacy, if proven, would form the basis for more substantial damages than being prevented from entering their home during the search. Also, if the Hills had wanted to base a claim on their exclusion from the apartment, then perhaps they could have alleged that they were temporarily deprived of their property rights without due process. But they did not bring that claim.

In sum, the illegal detention claim (Count 5) is dismissed as against Harrington.

## C. City Defendants' Motion for Summary Judgment

The City of Chicago, and individual defendants Elena McKenna, Scott Liebhaber, Robert Purvis, Matthew Pufpaf, John Gartner, David Rodriguez, Alan Lasch, Kevin Geyer, and Steven Suvada ("City Defendants"), move for summary judgment on all claims against them. The Court will again proceed claim by claim, although it will quickly become apparent that the same fatal flaw underlies several of the claims.

### 1. Count 1 (Entry and Search) / Count 2 (Occupation and Search)

The City Defendants assert that none of the named individual Chicago Police Department officers ever entered the Hills' home. R. 180, City Defendants' Brief at 3–5. The record supports this position, even when viewing the evidence in the light

15

most favorable to the Hills (as is required in considering this motion). If the Defendants did not enter the home, they cannot be held liable for an unconstitutional entry and search.

The most clear winners are CPD officers McKenna, Purvis, Pufpaf, Lasch, Geyer, and Suvada. These six officers never appeared on the scene at 4436 W. Jackson Blvd. City DSOF ¶¶ 51, 71. They all gave sworn testimony to this effect in their depositions. *Id.* Against this, the Hills cite two kinds of evidence. First, they cite several depositions in which the deponents testified that *some* CPD officers were there and entered the home. Pls. Resp.' City DSOF ¶ 51. But none of that testimony offers physical descriptions to aid in identifying those officers, or otherwise links specifically named defendants to the search. Second, the Hills offer, as circumstantial evidence, the OEMC Event Query assigning particular police "beats" associated with the officers to the scene. *Id.* Circumstantial evidence is all well and good, but the Hills are asking this Event Query to do too much. As the City Defendants have established, the Event Query alone does not give any information about who *entered* the home, or even who *appeared* on the scene.

The deposition of Erin Hansen, a 30(b)(6) witness called to interpret the OEMC Event Query, supports the Defendants' position. R. 229, City Defendants' Resp. to PSOAF ¶ 30. Hansen explained that just because a police beat was listed on the Event Query, did not mean that the beat was dispatched to the scene, let alone entered the building. *Id.* The association of the different beat numbers with the Event meant only that the officers were involved in *some* way with it. *Id.* The Hills were unable to

otherwise uncover how the beats were associated with the event, let alone that those officers entered the apartment. So the Event Query does not create a dispute of material fact around these six officers' presence at the house on West Jackson. Instead, no reasonable jury could find that those officers had any personal involvement in the search. The Hills' Fourth Amendment claims against them for unconstitutional entry and search, and for unreasonable scope of occupation and search, must be dismissed.

Moving on, Rodriguez, Liebhaber, and Gartner all appeared on the scene, but the Hills have not adequately alleged that they entered the house or participated in the search in any way. First, the Hills admit never speaking to Rodriguez or Liebhaber. Pls.' Resp. to City DSOF. ¶ 52. To pin liability on Rodriguez and Liebhaber, the Hills again rely only on the unspecific deposition testimony and the OEMC Event Query described above. Pls.' Resp. City DSOF ¶ 51. Without more, the Hills have not created a dispute of material fact around Rodriguez's and Liebhaber's involvement in the search.

The claim against Sergeant Gartner comes closest to surviving summary judgment. Gartner definitely was present at the scene that day, having responded to the IDOC's call for CPD assistance. City DSOF ¶¶ 44–45. Gartner asserts that he stayed in his car during the entire search and never entered or searched the apartment. *Id.* ¶¶ 14, 15, 46. But there is record evidence that would support a finding that, at the least, Gartner encountered Mrs. Hill. Beyond that, however, the evidence falls short. The Plaintiffs' Statement of Additional Material Facts alleges that Gartner entered the apartment and told Mrs. Hill she had to leave because the dogs were coming.

17

PSOAF City ¶¶ 25–26. But the cited portions of the record do *not* support this allega-

tion. First, Mrs. Hill never identified Gartner by name, but rather she referred to "a

police officer with white hair." D. Hill Dep. 74:10. It is worth noting that Gartner

describes his hair color as "brown going grey," and that two other CPD officers con-

firm this description. Gartner Dep. 49:20–24; R. 195-23, Rodriguez Dep. 51:17–24; R.

195-24, Liebhaber Dep. 74:2–10. It is therefore dubious enough for the Plaintiffs to

assume and argue that Gartner was the officer who spoke with Mrs. Hill based pri-

marily on his alleged hair color. More importantly, however, in Mrs. Hill's deposition,

she testified that, when she saw the person who might have been Gartner, he was

"coming up the *stairs*," D. Hill Dep. 100:22 (emphasis added)—she did not place him

in the apartment. During summary judgment briefing, Mrs. Hill later attempted to

change course by submitting a declaration averring that Gartner was in her apart-

ment when they spoke. D. Hill Decl. ¶ 24. But this plainly contradicts her deposition

testimony, so the Court must disregard it.[9] *See Diliberti v. United States,* 817 F.2d

1259, 1263 (7th Cir. 1987). In the end, the Plaintiffs have alleged, at best, that

---

[9]At no point in the briefing on the City Defendants' Motion for Summary Judgment do the Plaintiffs acknowledge the contradiction between Mrs. Hill's deposition testimony and her declaration, let alone purport to explain it. No argument has been made that Mrs. Hill's declaration simply expands or clarifies her deposition testimony, as when she and Mr. Hill identified Harrington in their Declarations. In fact, elsewhere in her deposition, Mrs. Hill's testimony apparently distinguishes between the stairs and her apartment as separate spaces. *See* D. Hill Dep. 57:2–3 (parole agent pushes Lewis up the stairs and into the house), 57:18–20 (Mrs. Hill had left the door to her apartment open when she came downstairs), 58:7–8 (Mrs. Hill asks for a warrant at the top of the stairs). When her declaration places maybe-Gartner inside her apartment, it contradicts her earlier deposition testimony that he was on the stairs.

The Plaintiffs do try to explain away the contradiction in the reply brief on their *own* motion. R. 240, Pls.' Reply Br. at 9–10. These arguments, besides not being especially persuasive, have been waived in the context of the Defendants' motions, because they came far too late for the Defendants to respond to them.

Gartner was at one point on the stairs to their apartment. This does not put him in the apartment or on the search team. The entry and search claims (Counts 1 and 2) must be dismissed as to Gartner too.[10]

### 2. Count 3: Seizure of Property / Damage to Property

Next, Charles Hill claims that the City Defendants illegally seized and retained his property, and also illegally damaged his property. The City Defendants win summary judgment on the seizure and damage claims for the same reason they won on the entry and search-related claims in Counts 1 and 2—the Hills have not placed any of them in the apartment, so they cannot have seized or damaged any property there. The damage claim would also be dismissed for the same reason discussed above: Mr. Hill is not really bringing a damage-to-property claim but seeking to refer to the damaged property to support his other Fourth Amendment claims.

The retention-of-property claim fares no better. For one thing, it is not at all clear whom Mr. Hill is targeting with this claim. He says he made several unsuccessful attempts to retrieve his firearms from the CPD but does not say who thwarted him from recovering the guns. PSOAF City ¶ 37. Some of the named City Defendants—Gartner, McKenna, Liebhaber, Pufpaf, and Purvis—were involved with inventorying the firearms and ammunition from the Hills' residence. City DSOF ¶¶ 57–59. But inventorying alone is not enough to support a claim that the officers unlawfully

---

[10]The Hills further argue that Gartner and Rodriguez have supervisor liability over any other CPD officers, and that all the defendant officers failed to intervene in wrongdoing. Pls.' Resp. Br. City at 9–10. Since they cannot place any of the defendants in the apartment during the search, they cannot be held liable under either of these theories, so the Court need not address them, except to note that there is no such thing as supervisory liability under 42 U.S.C. § 1983. *See Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988).

retained Charles's property. The Hills cite no case for the proposition that officers or other police personnel who merely carry out the inventorying of seized property are themselves committing a Fourth Amendment violation if the officer who made the initial seizure did so unreasonably. The officer who effectuated the seizure is the one who, well, made the seizure. Separately, Defendant Suvada did not even help with the inventory. *Id.* ¶ 66. All he did was look at the ammunition in its inventory bag as part of his investigation of Lewis. *Id.* ¶¶ 63, 66; R. 179-25, Suvada Dep. 27:19–23. That is not grounds for liability on a claim of unlawful retention of property.

Summary judgment is granted for all of the City Defendants on the entirety of Count 3.

### 3. Count 4: Due Process

Count 4 of the Complaint was another claim brought on only Mr. Hill's behalf, claiming that the Defendants illegally seized his firearms and ammunition without due process of law. Compl. ¶¶ 53–60. Defendants Walls and Harrington moved to dismiss this count, and their motion was granted. R. 98. As a technical matter, only Walls and Harrington had filed the motion to dismiss, so as of the filing of these summary judgment motions, the claim was still formally live against the City Defendants. But the Plaintiffs apparently believed that the claim was dismissed against all Defendants, declaring the defense's challenge as moot and declining to argue it in response to the City Defendants' Motion for Summary Judgment. R. 205, Pl. Response Brief to City Defendants at 15. So summary judgment is granted in the City Defendants' favor on this claim too.

#### 4. Count 5: Unlawful Detention

By now it should be clear that the Hills' Fourth Amendment unlawful detention claim against the City Defendants is doubly doomed. As discussed earlier, the Hills have not established a dispute of material fact as to whether any of the named defendants were present in the apartment for the search. Also, as discussed in the section of this Opinion devoted to Harrington's motion, the Hills have not established that they were detained by any law enforcement officer. If Gartner is the person who told Mrs. Hill she had to leave the apartment, then he is, at the very least, protected by qualified immunity just as Harrington is.

#### 5. Count 6: Indemnification

Because the Hills' claims against the individual City defendants are all dismissed, there is no need to keep the City of Chicago in the case as an indemnifier. Count 6 of the Complaint is also dismissed.

#### D. The Hills' Motion for Summary Judgment

Moving on to the Hills' summary judgment motion, it makes sense to proceed, again, party-by-party. But now that the Hills are the moving party, the facts must be construed in the Defendants' favor. Considering how the Hills fared when they were getting the benefit of the doubt on the facts, it should come as no surprise that their motion for summary judgment will be denied in full.[11]

---

[11]The Plaintiffs' motion to file a corrected version of their Response to the Defendants' Statement of Additional Material Facts is granted, so R. 237 is substituted for R. 234.

### 1. Jacob Walls

Although the Hills nominally seek summary judgment against Walls, their brief makes no arguments specific to him. R. 197, Pls.' Brief at 1. In their reply brief, they point out that they had moved to voluntarily dismiss Walls. R. 223, Pls.' Reply Brief HW at 1. The Court denied the motion, because the Hills sought to do so without costs but did not have the agreement of Walls to do so. R. 227. Based on all the summary judgment briefing, it is clear that the Plaintiffs no longer seek to prosecute their claims against Walls. So of course the Hills are not entitled to summary judgment against him.

### 2. Christopher Harrington

There is a fatal flaw in the Hills' summary judgment motion against Christopher Harrington on the search claims (Counts 1 and 2), the property-seizure claim (Count 3), and the detention claim (Count 5): Harrington testified, under oath, that he does not remember entering their home, searching their home, being asked for a warrant, or being told that IDOC agents did not have permission to search the apartment. HW DSOF ¶¶ 66–69. If he did not enter the Hills's home, then he cannot be held liable for an unconstitutional entry or search, unreasonable scope of the occupation or search, illegal seizure and retention of property, or damage to property. As for the Hills' illegal detention claim, Harrington has already won summary judgment against them on it when the evidence was viewed in the Hills' favor.

Harrington's credibility will be a question for the jury. At this stage, he has created a dispute of material fact that precludes this Court from entering summary judgment in the Plaintiffs' favor.

### 3. City Defendants

The Court has already explained why the City Defendants are entitled to summary judgment in their favor on all the Plaintiffs' claims against them. Obviously, this precludes the Hills from winning summary judgment. Their motion as to the City Defendants is denied.

An additional word is warranted on Defendant Gartner. In their corrected response to the City Defendants' Statement of Additional Material Fact, R. 237, the Plaintiffs introduce, for the first time, an excerpt from Donna Hill's deposition that the Hills contend describes her watching Gartner enter and exit the apartment several times. R. 237, Pls.' Resp. to DSOAF, ¶¶ 1–3, 14, 15, 19, 22. As an initial matter, the Plaintiffs waived their right to rely on this fact in opposing the Defendants' motions, since they did not introduce it until late in the briefing schedule on their *own* motion, giving the Defendants no chance to respond. In any case, this newly cited deposition excerpt does not solve the Plaintiffs' evidentiary problems. At this point in the deposition testimony, Mrs. Hill was sitting on her neighbor's porch across the street. D. Hill Dep. 102:8–14, 110:11–14. From this vantage point, she says she saw an officer with white hair wearing a white shirt (now claimed to be Gartner), "[c]oming in and out" of her house. *Id.* 111:6–13. She says that he went upstairs, came back down, and came in and out a few times. *Id.* 111:14–20. But from her vantage

point across the street on her neighbor's porch—and based on the photos submitted by the Plaintiffs themselves, R. 238—the most she could have seen is Gartner beginning to climb the stairs to the second-floor unit. Nor did she testify to seeing Gartner participate in the search. The Plaintiffs' brief says that when Gartner entered the house, he was "presumably monitoring or directing the search and seizure of firearms and ammunition." Pls.' Reply Br. at 9. But Mrs. Hill's testimony did not put him inside the apartment, or even outside of it looking in.

Finally, the Plaintiffs' reply brief makes much of Gartner's rank as a CPD sergeant, arguing that he must have had a supervisory role and participated in the search that day. Pls.' Reply Br. at 7–9. It is true that, despite the inapplicability of supervisory liability under § 1983, serving as the sergeant on the scene of a CPD search would be a solid *factual* piece of circumstantial evidence from which a jury might reasonably infer oversight and involvement in the search. But everyone agrees that *IDOC* initiated the search. (That is why a reasonable jury can make all sorts of inferences about the personal involvement of the instigator of the search—Harrington.) Nothing in the record suggests that Gartner would have taken charge of the IDOC agents on the scene. To the extent that the Plaintiffs offer arguments based on alleged CPD practices, and how the CPD and IDOC might interact, they are unsupported by record evidence. Just saying it in briefs is not enough at this stage of the case. The Hills would still need to place Gartner in the apartment to pin liability on him, and this they have not done.

## IV. Conclusion

The Plaintiffs' motion for summary judgment is denied. The summary judgment motions of Defendants Walls and Harrington, and the City Defendants, are granted in full. All claims against Jacob Walls are dismissed. So are the claims against Elena McKenna, Scott Liebhaber, Robert Purvis, Matthew Pufpaf, John Gartner, David Rodriguez, Alan Lasch, Kevin Geyer, Steven Suvada, and the City of Chicago. The Hills' claims against Christopher Harrington for illegal damage to property and for illegal detention are likewise dismissed. The claims against Harrington for unconstitutional entry and search, unreasonable scope of occupation and search, and illegal seizure and retention of property remain live.

In advance of the tracking status hearing of April 16, 2021, the parties shall initiate settlement negotiations, starting with a reasonable demand from the Plaintiffs. The parties shall file a status report on April 9, 2021, and at the least report on whether they want a settlement referral to the magistrate judge.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 31, 2021